UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

EARL G. NASH,

            Plaintiff,

    v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

            Defendant.

CASE NO.    C07-5553FDB-KLS

REPORT AND
RECOMMENDATION

Noted for September 12, 2008

Plaintiff, Earl G. Nash, has brought this matter for judicial review of the denial of his application

for disability insurance benefits.  This matter has been referred to the undersigned Magistrate Judge

pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule MJR 4(a)(4) and as authorized by Mathews,

Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After reviewing the parties' briefs and the remaining

record, the undersigned submits the following Report and Recommendation for the Honorable Franklin D.

Burgess's review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is 61 years old.[1] Tr. 23.  He graduated from high school, completed two years of

college and has past work experience as a security guard, a concrete quality control worker, a maintenance

---

[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to
Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

worker, an office clerk, an insurance valuation specialist, a census worker, and a telephone salesperson. Tr. 74, 80, 85, 470.

On April 7, 2005, plaintiff filed an application for disability insurance benefits, alleging disability as of January 15, 1999, due to atrial fibrillation, ice pick headaches, shortness of breath, and a very rapid heart rate. Tr. 23, 58-60, 72-73. His application was denied initially and on reconsideration. Tr. 23-25, 32. A hearing was held before an administrative law judge ("ALJ") on July 7, 2006, at which plaintiff, represented by counsel, appeared and testified, as did a medical expert and a vocational expert. Tr. 440-73.

On July 27, 2006, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

(1)     at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability;

(2)     at step two, plaintiff had "severe" impairments consisting of recurrent arrhythmias, congestive heart failure and migraine headaches;

(3)     at step three, plaintiff's recurrent arrhythmias and congestive heart failure met the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 4.05 from January 15, 1999, through November 1, 2004, but he experienced medical improvement as of November 1, 2004, and beginning on that date, none of his impairments met or equaled any of those listed in 20 C.F.R., Part 404, Subpart P, Appendix 1; and

(4)     at step four, beginning on November 1, 2004, plaintiff had the residual functional capacity to perform a modified range of light work, which did not preclude him from performing his past relevant work.

Tr. 16-22. Plaintiff's request for review was denied by the Appeals Council on August 3, 2007, making the ALJ's decision the Commissioner's final decision. Tr. 5; 20 C.F.R. § 404.981.

On October 4, 2007, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1-#5). The administrative record was filed with the Court on January 28, 2008. (Dkt. #15). Plaintiff argues the ALJ's decision should be reversed and remanded to the Commissioner for an award of benefits or, in the alternative, for further administrative proceedings for the following reasons:

(a)     the ALJ erred in evaluating the medical evidence in the record;

---

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

(b)     the ALJ erred in assessing plaintiff's credibility;

(c)     the ALJ erred in assessing plaintiff's residual functional capacity;

(d)     the ALJ erred in finding plaintiff capable of performing his past relevant work; and

(e)     the ALJ failed to meet his burden of showing plaintiff could perform other work existing in significant numbers in the national economy.

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, recommends that while the ALJ's decision should be reversed, this matter should be remanded to the Commissioner for further administrative proceedings. Although plaintiff requests oral argument in this matter, the undersigned finds such argument to be unnecessary here.

DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.      The ALJ Evaluation of the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." <u>Reddick</u>, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." <u>Id.</u> The ALJ also may draw inferences "logically flowing from the evidence." <u>Sample</u>, 694 F.2d at 642. Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." <u>Id.</u> at 830-31. However, the ALJ "need not discuss *all* evidence presented" to him or her. <u>Vincent on Behalf of Vincent v. Heckler</u>, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original). The ALJ must only explain why "significant probative evidence has been rejected." <u>Id.</u>; <u>see also</u> <u>Cotter v. Harris</u>, 642 F.2d 700, 706-07 (3rd Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. <u>Lester</u>, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." <u>Batson v. Commissioner of Social Security Administration</u>, 359 F.3d 1190, 1195 (9th Cir. 2004); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." <u>Id.</u> at 830-31; <u>Tonapetyan</u>, 242 F.3d at 1149.

A.     <u>Plaintiff's Recurrent Arrhythmias and Congestive Heart Failure</u>

Plaintiff argues that while the ALJ found his recurrent arrhythmias and congestive heart failure to be severe impairments, he failed to properly consider the medical evidence in the record documenting the symptoms and limitations that continued beyond November 1, 2004. As an example, plaintiff asserts that despite the ALJ's statement that he "had reverted to regular rhythm" by November 2004, a treadmill test

conducted in early November 2004, indicated plaintiff was able to exercise for less than six minutes. <u>See</u> Tr. 316. Plaintiff notes, in addition, that he also had an abnormal exercise treadmill test in late November 2004. <u>See</u> Tr. 313. Finally, plaintiff points to evidence in the record showing that he had atrial fibrillation and experienced dyspnea on exertion in early August 2006. <u>See</u> Tr. 438.

The undersigned agrees the ALJ failed to properly consider all of the medical evidence in the record concerning plaintiff's heart problems. It is true, as the ALJ pointed out in his decision, that the medical expert, Dr. Lawrence Duckler, testified at the hearing that plaintiff had "converted back to regular rhythm" in November 2004, that an EKG showed his heart rhythm to be normal in January 2005, and that he was "no longer in atrial fibrillation." Tr. 464. Dr. Duckler went on to testify:

> . . . He's had some evidence earlier on congenative [sic] heart failure, and so they appropriately put him on dioxin and diuretics, that's to control his heart failure, and he's done very well. He's no longer in heart failure. His last treadmill that they did in November of '04, they did an echocardiogram on him at the same time, and he showed no evidence of ischemia. His previous echocardiograms had been fairly normal . . . so he's got normal left ventricular. Then he doesn't have any ischemia of his heart, the valves are normal. So his cardiac status is quite stable. He's had hypertension in the past, and he's taking Zestril and a variety of drugs for it, but now his blood pressure is normal. . . .

<u>Id.</u> While there certainly is some medical evidence in the record to support Dr. Duckler's testimony, other such evidence shows that plaintiff's issues with his heart had not entirely abated.

As pointed out by plaintiff, in early November 2004, he diagnosed as having atrial fibrillation, with a "rather brisk heart rate response," ventricular tachycardia and an abnormal EKG which was felt could represent coronary disease. Tr. 316. Also as pointed out by plaintiff, an "[a]bnormal exercise treadmill test secondary to electrodiagraphic changes diagnostic of ischemia" was obtained in late November 2004, although an echocardiogram performed at that time revealed the presence of "normal thickening in all myocardial segments without evidence of ischemia." Tr. 313.

In late January 2005, plaintiff was diagnosed as having chronic atrial fibrillation. Tr. 350. Even though his heart was noted as continuing to have a regular rate and rhythm, without any murmurs, rubs or gallops, and plaintiff claimed he was "having less episodes of atrial fibrillation" in mid-September 2005, that claim indicates he still was having at least some episodes, and he again was diagnosed with chronic atrial fibrillation. Tr. 428. Plaintiff was noted to be "in a normal sinus rhythm" in early November 2005. Tr. 427. In early February 2006, he was found to be in atrial fibrillation with a regular heart rhythm and

1    rate, "but controlled." Tr. 426.

2         Plaintiff reported having "been doing fairly well" in early August 2006, but he was diagnosed with

3    atrial fibrillation and "[d]yspnea on exertion," and it was felt that "[t]he differential diagnosis could

4    include atherosclerotic heart disease, cardiomyopathy or blockade or under blockade of atrial fibrillation.

5    Tr. 437-38.  In early March 2006, plaintiff once more was diagnosed with atrial fibrillation, despite having

6    normal objective cardiovascular findings. Tr. 388.  This evidence suggests plaintiff continued to have at

7    least some periods where he exhibited atrial fibirillation.

8         The ALJ, however, adopted the testimony of Dr. Duckler that plaintiff did not have an impairment

9    or combination of impairments that met or equaled the criteria of any of those listed in 20 C.F.R. Part 404,

10   Subpart P, Appendix 1 (the "Listings"), as of November 2004, based in part on his acceptance of Dr.

11   Duckler's further testimony that plaintiff "had reverted to regular rhythm" by that time and thus did not

12   meet Listing 4.05. Tr. 20.  Given that, as set forth above, there does appear to be medical evidence in the

13   record of such reversion both during and subsequent to November 2004, it is not at all clear that the ALJ's

14   step three finding here is supported by substantial evidence.[3]

15        Defendant argues the medical evidence in the record is insufficient to show that plaintiff's

16   recurrent arrhythmias meet Listing 4.05,[4] which provides:

17        Recurrent arrhythmias, not related to reversible causes, such as electrolyte
          abnormalities or digitalis glycoside or antiarrhythmic drug toxicity, resulting in
18        uncontrolled (see 4.00A3f), recurrent (see 4.00A3c) episodes of cardiac syncope or
          near syncope (see 4.00F3b), despite prescribed treatment (see 4.00B3 if there is
19        no prescribed treatment), and documented by resting or ambulatory (Holter)
          electrocardiography, or by other appropriate medically acceptable testing, coincident
20        with the occurrence of syncope or near syncope (see 4.00F3c).

21   20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.05.  As did the ALJ, defendant points to Dr. Duckler's testimony

22   that plaintiff did not meet Listing 4.05 because he had converted back to regular rhythm by that time, he

23   _____

24        [3]At step three of the sequential disability evaluation process, the ALJ must evaluate the claimant's impairments to see if
     they meet or equal any of the impairments listed in 20 C.F. R. Part 404, Subpart P, Appendix 1. 20 C.F.R § 404.1520(d); Tackett
25   v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  If any of the claimant's impairments meet or equal a listed impairment, he or she
     is deemed disabled. Id.  The burden of proof is on the claimant to establish he or she meets or equals any of the impairments in the
26   Listings.  Tacket, 180 F.3d at 1098.  An impairment meets a listed impairment "only when it manifests the specific findings
     described in the set of medical criteria for that listed impairment." SSR 83-19, 1983 WL 31248 *2.

27        [4]Defendant further argues that to the extent plaintiff argues he should have been found to meeting Listing 4.02 (concerning
     chronic heart failure), he has failed to present sufficient evidence or specific argument as to how that Listing is met.  However, the
28   undersigned finds this issue is not properly before the Court, as, indeed, plaintiff has not presented that argument, and thus it need
     not be addressed and the undersigned will not consider it here.

did not have heart failure and was no longer in atrial fibrillation, and his cardiac status and blood pressure were normal. But, again, as noted above, medical evidence from November 2004, and later does call into question the validity of Dr. Duckler's testimony on this issue.

Although not expressly asserted, defendant appears to also be implying that because there is a lack of evidence in the record that plaintiff suffered from syncope or near syncope, the criteria of Listing 4.05 is not met on this basis as well. Dr. Duckler, however, did not testify that plaintiff met the criteria of Listing 4.05 for the period of January 1999, through November 2004, on this basis, testifying instead in response to the question as to whether any Listings were met during that period as follows:

> Well, I think that singularly, since he's never had any episodes of syncopy, or he's never fainted or near fainted. His wife has talked about when he's out of rhythm, he gets weak, debilitated and he has some palpation symptoms but nothing specifically. But I would say in combination, he does meet listings up until the time his rate became normal. In combination of chronic idiopathic atrial fibrillation and congestive heart failure, both of which have been corrected. They're manifested -- in other words, his heart functions are normal now. Echocardiogram is normal, his rate is regular. But at that time, between the '99 you point out and the '04, he had both. He had irregular heart rate risks involved and of atrial fibrillation with -- even though he was managed with Coumadin. It would carry considerable risk. And the fact that he had a congestive heart failure, even though he doesn't have any signs of heart attacks in the sense he doesn't have ischemia or valvular trouble. He did have cardiomegaly. In other words, his heart was a little enlarged enough so that his clinicians were smart enough to put him on Digitalis and diuretics that control him well which has proved to be very [INAUDIBLE] for him -- I, mean, satisfactory for him.

> . . . So I think he'd meet listings in combination . . . from '99 to '04, but not after '04.

Tr. 465-66. The medical evidence in the record from the period of November 2004 and thereafter, though, does indicate that these problems may have persisted to one extent or another. Thus, while that evidence does not necessarily show plaintiff continued to meet Listing 4.05, the issue remains open, making remand for further consideration thereof appropriate.

Plaintiff argues the ALJ further erred in failing to consider what effect the shortness of breath and fatigue he experienced due to his recurrent arrhythmias and congestive heart failure had on his residual functional capacity to perform his past relevant work and other jobs existing in significant numbers in the national economy at steps four and five of the sequential disability evaluation process. But, other than the abnormal exercise treadmill tests noted above, there is little in way of medical evidence in the record to support the presence of these symptoms or their connection to plaintiff's heart problems. Nevertheless, given that the ALJ erred in his evaluation of the medical evidence and, as discussed below, his assessment of plaintiff's credibility, it is not clear the ALJ properly considered this issue as well. Thus, on remand, if

it still is determined that plaintiff's recurrent arrhythmias do not continue to meet the criteria of Listing 4.05 as of November 2004, the Commissioner also shall consider whether any of the symptoms plaintiff had as a result of his heart problems affected his residual functional capacity as well.

B.    Plaintiff's Headaches

In his decision, the ALJ found that although plaintiff alleged that he still experienced "'ice pick' headaches several times per day," there was "no objective evidence to substantiate this." Tr. 20.  The ALJ also found that there was evidence plaintiff's headaches were "well controlled with certain medications." Id.  Plaintiff argues the ALJ erred here by failing to consider all of the medical evidence in the record that described the symptoms and limitations caused by his headaches.  Although it is true that the ALJ did not mention all of the evidence in the record concerning plaintiff's headaches, the undersigned does not find that the ALJ's consideration of that evidence was lacking.  Indeed, the undersigned agrees with the ALJ's evaluation thereof and conclusions with respect thereto.

As an example of objective medical evidence supporting his claim of disabling headaches, plaintiff points to a September 14, 2005 statement made by Bruce C. Douglas, M.D., in which he noted that plaintiff "did have one-ice pack [sic] 'headache' during the examination," and he became "rather animated with moaning and groaning and point[ed] to his head." Tr. 428.  This, however, hardly constitutes objective medical evidence or clinical findings supporting the presence of a disabling condition.  Rather, Dr. Douglas was merely noting what plaintiff reported and how he was acting during the examination.  Further, the tone of this statement strongly indicates Dr. Douglas's skepticism here.  Indeed, Dr. Douglas went on to state that plaintiff was "pushing for disability because of these headaches." Id.  Had Dr. Douglas actually believed there to have been a medical basis for those headaches, he would have included such a diagnosis in the assessment section of his treatment note, but did not do so. See id.

Plaintiff next points to a letter, dated November 10, 2005, in which Howard S. Taylor, M.D., wrote in part as follows:

> . . . As you know, he has about four years of daily short sharp headaches.  They continue unabated, he gets them several times each hour, they come without any warning and they occur all over the head, but not the forehead, mostly the top, side and back.  It feels like an ice pick, it last [sic] for two to three seconds, it is very severe and then it goes away.  He can have clusters of them happening, four or five within 30 seconds, which can be disabling.  The ongoing problem has been disabling for him, he does not want to do anything and he does not take enjoyment in doing things, even at home . . .

We failed to help him with multiple medical trials. He has tried antidepressants like Lexapro, anti-convulsant [sic] like Neurontin, Topamax and Lyrica, anti-inflammatories like Indocin and beta blockers like Inderal. Recently the Lycra was tried and it made him like a zombie at 75 b.i.d. and did not help and 75 a night is not helping but has caused him to gain 9 pounds, have trouble urinating and constipation.

. . .

. . . Earl has short sharp ice pick headaches. I am not sure of the cause. I suppose it is idopathic migraine like process. I do not think that he was vasculitis or any type of brain lesion or aneurysm that is causing this.

Tr. 379-80. What plaintiff does not point out is that Dr. Douglas also wrote that:

We do not know the cause of these headaches. We recently repeated an MRI and MRA of the brain. A previous scan was done two years ago that was normal. The new scans I looked at today are also normal. There are no signs of mass or aneurysm.

Tr. 379. As such, the symptoms and limitations Dr. Douglas reports here appear to have come solely from plaintiff's own subjective complaints, rather than any objective clinical findings. Thus, while Dr. Douglas did attempt a diagnosis as to the nature of what plaintiff was describing, the ALJ was not remiss in finding no objective medical evidence to substantiate plaintiff's complaints.

The same is true with respect to a letter provided by Vitalie D. Lupus, M.D., in late September 2006, to which plaintiff also points, in which Dr. Lupus wrote in part:

. . . The patient apparently has two types of headaches. First, he has a sudden, sharp, striking like lightning headaches, which are severe in intensity and localized bilaterally over the sides of the head posteriorly and more rarely in the front of the head on the vertex. The headaches are quite frequent. He may have 50 or 60 episodes over every day. Most of them are mild to moderate in severity and at times he has quite severe sharp pains like an ice pick. Frequency of the headache has definitely bothered him a lot. Apparently the headaches are not associated with any other symptoms. They last very briefly, several seconds. In addition, the second type of headache is much longer in duration, lasting two to three hours. On occasion he has them once or twice a week without warning. They are more unilateral, either right side or on the left side. She [sic] does have increased sensitivity to light and noise. When these headaches occur, either in the office or at home, he has to lie down, go to a dark room, and stop his activities until the headaches go away. The patient was seen in the past by Dr. Taylor and a headache specialist. He has tried a variety of medications such as Neurontin, Topamax, Lyrica, Indocin, Lexapro, but he has not responded to any of these medications.

. . .

. . . It appears that his headaches are of two types. The more brief bilateral lightening type pain are consistent with neuralgic pains. In addition, the unilateral throbbing, longer lasting headaches with allodynia. They are very suggestive of migraine type headache without aura.

Tr. 435-36. Once again, plaintiff fails to note that the only objective clinical finding made by Dr. Lupu

during the physical examination itself was to comment that plaintiff was "not in distress" at the time, and that he stated "that he had several episodes of brief headaches while in the office which went unnoticed by me." Tr. 436. Indeed, Dr. Lupu's actual diagnosis of plaintiff consisted of "chronic headaches and normal neurological examination." Id.

In addition, while both Dr. Douglas and Dr. Lupu reported that plaintiff had tried, but had failed to respond to, a number of medications, or which did not help him and/or caused various side effects – and there are other similar reports in the record to that effect (see Tr. 224, 228, 381-83, 405, 410, 438, 465) – the record also shows, as the ALJ found, that the headaches achieved good control on certain medications (see Tr. 169, 224, 281-82, 357, 405). For example, plaintiff was noted to have marked improvement in the frequency and severity of his headaches on a lower dosage of gabapentin. See Tr. 212, 219, 393-94, 400. In late September 2004, furthermore, Dr. Douglas's report notwithstanding, Inderal was observed to have "had a significant decrease in the frequency and duration of headaches," with plaintiff having "only really had one headache and it was very mild." Tr. 357.

Lastly, plaintiff points to a comment made by Bradley Evans, M.D., in early August 2006, in which he noted hat plaintiff's "biggest problem is headaches," and – as had been reported by Dr. Douglas and Dr. Lupu – that he had "been on multiple medications with no clear relief of the headaches." Tr. 438. In regard to the latter, as discussed above, the record shows this not to be true for all medications. In addition, Dr. Evans's statement that the headaches are plaintiff's biggest problem, for the same reasons discussed above, do not constitute objective medical evidence, but merely is a comment on what plaintiff himself reported to him. The undersigned does agree with plaintiff that the Court should not affirm the ALJ's determination here on the basis that there is no evidence of disabling headaches prior to his date last insured, as this was not one of the ALJ's stated reasons for finding as he did here. Nevertheless, as explained herein, the ALJ did not err in his evaluation of the medical evidence concerning those headaches.

II.     The ALJ Erred in Assessing Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). The Court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is

based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence.  Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

In discounting plaintiff's credibility, the ALJ began his explanation as to why he was doing so as follows:

> After considering the evidence of record, the undersigned finds that although the claimant does have underlying medical conditions that could reasonably result in the symptoms he alleges if he failed to follow his medical regimen or attempted to exceed his residual functional capacity, the claimant's allegations as to the intensity, persistence and limiting effects of his symptoms are disproportionate and not supported by the objective medical findings or by any other corroborating evidence.

Tr. 21.  Plaintiff argues that this statement is incorrect and has no factual basis.  Specifically, plaintiff asserts there is no evidence to support the ALJ's inference that he is failing to comply with his medical regimen or attempting to exceed his residual functional capacity.  But the undersigned finds no such inference here.  Rather, the ALJ merely is stating that so long as plaintiff continues to follow his medical regimen and not exceed that capacity, he does not suffer from disabling symptoms as claimed.  Thus, while the undersigned, for the reasons set forth below, is remanding this matter in part due to the ALJ's errors in assessing plaintiff's credibility, such remand is not because of the above statements.

Plaintiff next argues the ALJ's statement that his description of his symptoms and limitations is not proportionate or supported by the objective medical findings was erroneous, asserting that once the medical evidence in the record establishes that a claimant has a medical condition that reasonably can be expected to cause the symptoms and limitations he or she describes, the ALJ may not disregard his or her testimony because it is disproportionate and not supported by that evidence. Plaintiff's statement of the law here is incorrect. A determination that a claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement. Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998). It is true that the ALJ first must determine whether there is objective medical evidence of an impairment that reasonably could be expected to produced some degree of the symptoms alleged. See Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986); Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir.1991) (en banc)) (claimant must produce medical evidence of underlying impairment which is reasonably likely to be cause of alleged pain).

Determining whether there is a sufficient medical basis for the existence of an impairment which could be expected to cause the degree of symptoms being alleged, however, is distinctly different from a determination as to whether the medical evidence in the record overall supports that degree. That is, the first step in assessing a claimant's credibility is concerned with the question of whether there is an actual medically determinable impairment that could cause the alleged symptoms. It is not a finding that those symptoms are caused or consistent with evidence of the underlying impairment. This is because a claimant must have a medically determinable impairment in order to be entitled to disability benefits. See Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (claimant must show he or she suffers from medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for continuous period of not less than twelve months).

It is only after the presence of such an impairment has been determined that the ALJ then goes on to determine whether the evidence in the record, medical or otherwise, actually supports the alleged degree of disability or limitation. This is why, as noted above, the Ninth Circuit expressly has held that determining that a claimant's complaints are inconsistent with the objective medical evidence in the record can satisfy the clear and convincing requirement. See Regennitter, 166 F.3d at 1297. The only limitation on using this as a reason for discounting a claimant's credibility is that the claimant's testimony may not

be rejected <u>solely</u> because the degree of symptoms alleged is not supported by objective medical evidence. <u>See</u> <u>Rollins v. Massanari</u>, 261 F.3d 853, 856 (9th Cir.2001); <u>Byrnes v. Shalala</u>, 60 F.3d 639, 641-42 (9th Cir. 1995); <u>Orteza v. Shalala</u>, 50 F.3d 748, 749-50 (9th Cir. 1995); <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 346-47 (9th Cir.1991) (<u>en banc</u>)). This is because to allow otherwise "'would render meaningless' the requirement that" the ALJ "consider all relevant evidence," not just that which is medical. <u>Bunnell</u>, 947 at 347 (citation omitted). Plaintiff's analysis would overturn longstanding Ninth Circuit precedent.

That being said, the undersigned finds the ALJ's finding that plaintiff's allegations concerning the intensity, persistence and limiting effects of his symptoms are disproportionate to the objective medical evidence in the record to be unpersuasive. This is because, as discussed above in the previous section, the ALJ erred in evaluating the medical evidence in the record concerning plaintiff's recurrent arrhythmias and congestive heart failure. While it is not clear that the medical evidence regarding those conditions actually supports plaintiff's allegations – and the undersigned makes no such finding here given the ALJ's failure to further consider that evidence at this stage of the sequential disability evaluation process – the ALJ has not shown that it clearly is inconsistent therewith either.

The ALJ also discounted plaintiff's credibility because the record reflected "work activity after the alleged onset date," and that while "that work activity did not constitute disqualifying substantial gainful activity," it suggested "his symptoms may not have been as serious" as alleged. Tr. 21. Plaintiff, relying on <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028 (9th Cir. 2997), argues that the fact that he had attempted to work part-time is not a convincing reason to reject his testimony regarding his symptoms and limitations. But <u>Lingenfelter</u> is factually distinguishable. In that case, the Ninth Circuit stated that the mere "fact that a claimant tried to work for a short period of time and, because of his impairments, *failed*," does not mean "that he did not then experience pain and limitations severe enough to preclude him from *maintaining* substantial gainful employment." <u>Id.</u> at 1038 (emphasis in original).

In <u>Lingenfelter</u>, the claimant was fired from a job he had performed for a period of nine weeks after his date last insured, "because he was too slow to do the work adequately." <u>Id.</u> at 1033. The claimant also testified that "when he returned home from work each day his 'feet were so swollen,' and that he 'just couldn't do it anymore' because of the pain." <u>Id.</u> (quoting plaintiff). The record in this case, however, does not contain significant probative evidence that plaintiff was forced to quit working due to his

impairments and limitations. <u>See</u> Tr. 448-49. The Ninth Circuit in <u>Lingenfelter</u> also expressly noted that

the claimant's "failed work attempt did not even take place during the relevant time period" – i.e., the

period between his alleged onset date of disability and his date last insured. 504 F.3d at 1039 (noting

claimant had burden to prove he was disabled for at least twelve month period during that time). Here,

though, the record fails to provide any clear indication that the work activity at issue in this case occurred

outside the relevant time period in this matter. <u>See</u> Tr. 448-49.

　　The last reason the ALJ gave for discounting plaintiff's credibility was the following:

> The claimant has also described daily activities that are not limited to the extent one
> would expect, given the complaints of disabling symptoms and limitations. The record
> reflects claimant has reported the following daily activities: playing a musical
> instrument, maintaining a website for his church, performing household chores such as
> vacuuming, doing a load of laundry, unloading the dishwasher and caring for two pet
> dogs. In addition he helps with the shopping, spends a couple of hours daily doing e-
> mail and blogs on a home computer, and read novels. These activities tend to suggest
> claimant may still be capable of performing the basic demands of competitive,
> remunerative, unskilled work on a sustained basis.

Tr. 21. Plaintiff argues that none of the activities listed are inconsistent with his testimony regarding his

limitations or show that he has the physical capacity to perform any competitive full-time employment.

While these type of activities could be inconsistent with plaintiff's testimony and show such a capacity for

work, the evidence in the record fail make that showing in this case.

　　To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her

daily activities. <u>Smolen</u>, 80 F.3d at 1284. Such testimony may be rejected if the claimant "is able to spend

a substantial part of his or her day performing household chores or other activities that are transferable to a

work setting." <u>Id.</u> at 1284 n.7. The claimant need not be "utterly incapacitated" to be eligible for disability

benefits, however, and "many home activities may not be easily transferable to a work environment." <u>Id.</u>

Certainly, the record shows plaintiff engaged in the above activities, but not nearly to the extent implied by

the ALJ. For example, plaintiff reported that his wife provides most of the care for the dogs, that he folds

the laundry only as feels up to it, that the other household chores are done "some each week" and again in

accordance with how he feels, and that maintaining his church's website takes only about 20 minutes per

week. Tr. 98-99, 459-60. While plaintiff did report spending a couple of hours being on the computer in

the mornings (Tr. 462), this does not in itself necessarily show an ability to perform full-time work, and it

is unclear how often and for how long he performs the other noted activities.

Defendant argues the ALJ properly considered plaintiff's lack of treatment for his heart ailments and noted his headaches were well-controlled by medication. But the ALJ did not list either of these factors as specific reasons for discounting plaintiff's credibility. Thus, the only valid reason the ALJ did give for not finding plaintiff to be fully credible is the part-time work he did, which, by itself, provides a questionable basis for upholding the ALJ's credibility determination. See Lingenfelter, 504 F.3d at 1038 (nine-week work period alone not clear and convincing reason for rejecting claimant's subjective pain and symptom testimony). Id. at 1038. Accordingly, the undersigned finds the ALJ's credibility determination overall is not supported by substantial evidence in the record. Tonapetyan, 242 F.3d at 1148.

III.     The ALJ's Assessment of Plaintiff's Residual Functional Capacity

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2. A claimant's residual functional capacity ("RFC") assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. Id. It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id. However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id. Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id. In assessing a claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

Here, the ALJ assessed plaintiff with the following residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that, beginning on November 1, 2004, the claimant had the residual functional capacity to lift and carry twenty pounds occasionally and ten pounds frequently. During an eight-hour day, he can sit for up to six hours and stand or walk for up to two hours. Furthermore, he should not use ladders, ropes or scaffolds, and is limited to only occasional climbing, balancing, stooping, kneeling, crouching and crawling. Finally, the claimant should avoid even moderate exposure to hazardous conditions.

Tr. 21. Plaintiff argues this RFC assessment is erroneous, because the ALJ failed to properly consider all

of the medical evidence in the record and his own testimony. The undersigned agrees. Given the ALJ erred in evaluating the medical evidence in the record concerning plaintiff's heart problems and in assessing his credibility, it is unclear the above assessment is accurate.

The undersigned disagrees, however, that the ALJ was required to include therein plaintiff's alleged need to take one or two naps during the day due to fatigue, shortness of breath when performing activities, or inability to read or do much of anything when he gets headaches. The only evidence tending to support these limitations comes from plaintiff's own self-reports and testimony. That is, the medical evidence in the record provides no support therefor. This includes plaintiff's abnormal exercise tests, the results of which by themselves give little, if any, indication of his actual physical work-related limitations. Further, while the ALJ did err in assessing plaintiff's credibility, given the dearth of medical evidence in the record supporting the kind of limitations being sought to be adopted here, it is not at all clear, as noted above, that the ALJ would be required to adopt them. For the same reasons, the undersigned also declines to find that the evidence in the record as a whole supports a finding of inability to perform any work on a regular and continuing basis at this point.

IV.     The ALJ's Step Four Analysis

Plaintiff has the burden at step four of the disability evaluation process to show that he is unable to return to his past relevant work. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999). Based on the testimony of the vocational expert, the ALJ in this case found plaintiff to be capable of performing his past relevant work as an office clerk, an insurance specialist and a telephone salesperson. Tr. 22. Plaintiff argues this finding is clearly erroneous and not supported by substantial evidence, because it is based on the ALJ's improper assessment of his residual functional capacity. For the same reasons and to the same extent discussed above, the undersigned agrees. Accordingly, remand for further consideration of this step in the sequential disability evaluation process is warranted.

V.     Step Five of the Sequential Disability Evaluation Process

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett, 180 F.3d at 1098-99; 20 C.F.R. § 404.1520(d), (e). The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines

(the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000). However, because the ALJ found, albeit improperly, that plaintiff was capable of performing his past relevant work, he was not required to then proceed on to step five of the sequential disability evaluation process. See 20 C.F.R. § 404.1520 (if claimant is found disabled or not disabled at any particular step of sequential disability evaluation process, disability determination is made at that step, and sequential evaluation process ends).

Plaintiff argues that when the vocational expert was asked to assume an individual with his same age, education, vocational background and residual functional capacity, also had to lie down at least once or twice a day for at least an hour at unscheduled times outside of normal break times, such a limitation would preclude employment. See Tr. 471-72. Again, however, the medical evidence in the record fails to show plaintiff would have such a need. Accordingly, based on the record currently before the Court, the undersigned cannot say the ALJ would be required to adopt this additional limitation. As such, plaintiff at this time has not definitively shown he is disabled at this step.

VI.     This Matter Should Be Remanded for Further Administrative Proceedings

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292. Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001). Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002). Because issues still remain with respect to the medical evidence in the record concerning plaintiff's heart problems, plaintiff's credibility, his residual functional capacity, and his ability to perform his past relevant work,

this matter should be remanded to the Commissioner for further administrative proceedings. If, on remand, it is determined that plaintiff cannot return to his past relevant work, the Commissioner also shall determine if he is able to perform other work existing in significant numbers in the national economy at step five of the sequential disability evaluation process.

Plaintiff argues the opinions of several of his physicians who made findings regarding his recurrent arrhythmias and congestive heart failure must be credited as true in light of the ALJ's errors in evaluating that medical evidence. It is true that where the ALJ has failed "to provide adequate reasons for rejecting the opinion of a treating or examining physician," that opinion generally is credited "as a matter of law." Lester, 81 F.3d at 834 (citation omitted). However, where, as here, the ALJ is not required to find the claimant disabled on crediting of evidence, this constitutes an outstanding issue that must be resolved, and thus the Smolen test will not be found to have been met. Bunnell v. Barnhart, 336 F.3d 1112, 1116 (9th Cir. 2003). Further, "[i]n cases where the vocational expert has failed to address a claimant's limitations as established by improperly discredited evidence," the Ninth Circuit "consistently [has] remanded for further proceedings rather than payment of benefits." Bunnell, 336 F.3d at 1116. Indeed, as discussed above, the improperly discredited evidence in this case fails to establish the additional limitations plaintiff is claiming make him unable to work and therefore disabled.

It also is true that the Ninth Circuit has held remand for an award of benefits is required where the ALJ's reasons for discounting the claimant's credibility are not legally sufficient, and "it is clear from the record that the ALJ would be required to determine the claimant disabled if he had credited the claimant's testimony." Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003). The Court of Appeals in Connett went on to state, however, that it was "not convinced" the "crediting as true" rule was mandatory. Id. Thus, at least where, again as in the case at hand, findings are insufficient as to whether a claimant's testimony should be "credited as true," it appears the courts "have some flexibility in applying" that rule. Id.; but see Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004) (applying "crediting as true" rule, but noting its contrary holding in Connett).[5]

_____

[5]In Benecke, the Ninth Circuit found the ALJ not only erred in discounting the claimant's credibility, but also with respect to the evaluations of her treating physicians. Benecke, 379 F.3d at 594. The Court of Appeals credited both the claimant's testimony and her physicians' evaluations as true. Id. It also was clear in that case that remand for further administrative proceedings would serve no useful purpose and that the claimant's entitlement to disability benefits was established. Id. at 595-96.

CONCLUSION

Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for further administrative proceedings in accordance with the findings contained herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **September 12, 2008**, as noted in the caption.

DATED this 20th day of August, 2008.

Karen L. Strombom
United States Magistrate Judge